PEOPLES WATER COMPANY OF MILLVILLE, NEW JERSEY, respondent,

*v.*

CITY OF MILLVILLE, appellant.

[Decided January 25th, 1924.]

On appeal from an order of the court of chancery advised by Vice-Chancellor Leaming, who filed the following opinion:

"The only issue here involved is the ascertainment of a basis of accounting between complainant and defendant. No essential facts are in dispute. When the manner of accounting shall have been ascertained, a master can easily state an account between the parties.

"In 1901 complainant was the owner of a system of water works which included not only a water supply station but also the pipes in the streets of defendant municipality, and contracted with defendant to supply it with water for a period of twenty-five years at specified rates. During that period the municipality was to sell to consumers the water so supplied and was to receive on its own account all revenues from such sales. An option of purchase by the city was also contained in the contract, but that option was not exercised.

"During the progress of operations under that contract disputes arose between the water company and the city touching the amounts earned by the company for water supplied under the contract, the municipality claiming that by subsequent arrangements it had become entitled to water at the flat rate of $10,000 per annum, and each quarter thereafter the municipality would pay to the water company $2,500, and each quarter the water company would make claim to a greater amount. In July, 1920, the claims made by the company against the city, in excess of the $10,000 per year which the city had paid, aggregated $32,271.09 as of May 20th, 1920. The city also had claims against the water company for unpaid taxes.

"In this situation, on July 21st, 1920, the water company made a written proposition to the city for the sale of the plant to the city and for a compromise of all matters in dispute. This proposition was an offer to sell the plant to the city for $125,000, clear of all encumbrances, and waive all claims against the city for the balance claimed to be due it; the city to also waive its claims for delinquent taxes. The offer further proposed that if the city would accept the offer conditional on a ratification by the electors of the city and submit the proposed settlement to the electors at the succeeding November election, and the election should be favorable to the purchase on the terms proposed, settlement should be made on or before January 1st, 1921.

"That offer was accepted by the city subject to the approval of the electors, and at the election in the following November the acceptance by the city was approved. The result of the election was duly certified and reported to the water company November 22d, 1920.

"On January 1st, 1921, the day provided for the consummation of the contract, both the water company and the city were ready, willing and desirous of making settlement pursuant to the contract, but were unable to do so by reason of two writs of *certiorari* which had been issued a day or two before that date. One writ was to review and determine the

validity of the contract of the city for the purchase of the water works, the other to review and determine the validity of a bond issue which had been authorized by the city in contemplation of the purchase. Since these writs prevented the city from consummating the purchase at the time agreed upon, and the necessity to supply water to the inhabitants of the city was paramount, the water company continued to operate the plant as theretofore from the necessities of the situation, that is, the water company continued to operate the pumping station to supply water for the city, and the city continued to supply the inhabitants with water and to collect its water rates from the inhabitants. No negotiation or agreement was had between the water company and the city touching their mutual resultant obligations between the date agreed upon for the settlement and such time as the city should be privileged to make settlement under the contract of sale.

"The validity of the contract for the purchase of the plant was subsequently affirmed by the supreme court and later by the court of errors and appeals, and the *remittitur* of the latter court was filed February 15th, 1922. The *certiorari* relating to the bond issue was sustained on motion of the city because the bonds which were authorized were not serial as required by ordinance.

"A supplementary ordinance was then adopted by the city authorizing the bonds and providing for their delivery on April 18th, 1922. That ordinance was removed to the supreme court by *certiorari* and the *certiorari* was by that court dismissed November 17th, 1922. An appeal from that order of the supreme court was dismissed February 28th, 1923.

"It will be observed that these writs of *certiorari* relating to the proposed bonds were operative to prevent the city from issuing the bonds it desired to issue until February 28th, 1923. The *certiorari* to review the contract of sale was also operative to prevent the city from accepting a deed of conveyance for the plant until ten days after February 15th, 1922, the date on which the *remittitur* was filed. A few days thereafter the water company tendered a deed of conveyance,

which deed the city was unable to accept because of the pend-
ing writ of *certiorari* to review the proceedings for the issu-
ance of the bonds.

"Since this bill was filed, and on March 9th, 1923, convey-
ance of the plant was made to the city and the purchase
price of $125,000 was paid by the city to the water company.
This was done by stipulation under a court order in this
suit, the order providing that the transaction should in no
way be operative as a waiver of the claims of either of the
parties touching their respective rights or obligations which
have arisen since the contract of sale was by its terms to have
been consummated. Accordingly, the prayer of the bill for
specific performance of the contract has been satisfied in all
respects except that of an accounting between the parties.

"It follows that the primary inquiry at this time is the
ascertainment of the basis of an accounting between the
parties from the date on which the contract of sale should
have been consummated until it was consummated, that is,
from the beginning of the year 1921 to March 9th, 1923.

"The water company invoked the well-established rule that
in contracts for the sale of land, the contract is regarded, for
most purposes, as if specifically executed on the day agreed
upon; the purchaser then becomes the equitable owner of
the lands, and the vendor the equitable owner of the purchase-
money; each is trustee for the other from that date. This
rule, if applied, will charge the city with the cost properly
incurred by the water company in the operation of the water
station from the agreed date of settlement until the city ac-
tually took over the plant, and also will charge the city with
interest on the purchase price during the same period, and
the city will retain all revenues from consumers during that
period.

"This equitable rule, above referred to, with its applica-
tions and exceptions, has been so frequently considered in
this state that little appears to remain for inquiry touching
it. In *Haughwout* v. *Murphy, 22 N. J. Eq. 531* (at *p. 546*),
Mr. Justice Depue points out its general application and
effect and collects prior authorities of this state. Later au-

thorities in this state are collected and reviewed by Vice-Chancellor Stevens in *Jersey City* v. *Flynn, 74 N. J. Eq. 104* (at *pp. 115, 118, 121*). The accepted rule is that in an accounting between the parties in the absence of stipulations to the contrary the purchaser is to be deemed the owner of the property and the seller the owner of the money from the time fixed for the completion of the contract. *Jersey City* v. *Flynn, supra* (at *p. 115*). But, as pointed out in that case, this rule, equitable in its origin and nature, is subject to exceptions and modifications based upon equitable considerations incident to a given case. Thus in *King* v. *Ruckman, 24 N. J. Eq. 556,* it is determined that where the delay in consummating the contract is due to the fault of the vendor the rule cannot equitably be enforced for his benefit. In *Jersey City* v. *Flynn, supra,* the accepted equitable rule was held to be overcome by the express stipulations of the parties.

"Neither stipulations of the parties nor equitable considerations appear to exist in this case to remove it from the normal operation of the rule above stated. On the day agreed upon for making title complainant was ready to deliver a deed of conveyance, but the city could not properly then accept a deed of conveyance by reason of the existence of a writ of *certiorari* which had been issued to review the validity of the contract, and another writ which challenged the validity of the bonds from the proceeds of which bonds the city was to procure the money to pay for the plant. The writ directed against the contract in no way questioned the power of the water company to convey; it was based upon want of power of the city to buy. The other writ questioned the validity of the bonds and in no way concerned complainant. Accordingly the non-consummation of the contract on the day agreed upon was through no fault of the vendor. Its title was perfect and it was ready and anxious to perform on the day. No case has been brought to my attention in which the normal operation of the rule has been denied to a vendor in the absence of fault on his part. The inability of a vendor to deliver a perfect title on the agreed day by reason of defects in his title is obviously a fault attributable to the

vendor. The writ was subsequently determined to have been wrongfully sued out. Conveyance was promptly tendered as soon as that writ was dismissed. Accordingly the lawful contract of the parties and all equitable considerations accompanying it contemplated that on the agreed date of settlement the vendee should become the owner of the plant and the vendor the owner of the purchase price. The contract was, in effect, that on that date the purchaser should assume all the benefits and burdens arising from the operation of the water supply plant and the seller should in like manner enjoy the purchase price. There appears to be no reason why the parties should not be permitted to enjoy their lawful engagements in that respect; no act of either of the parties, save the error of the city touching its bonds, prevented consummation on the due day. No deed was then tendered, but a tender would have been futile, since the city could not accept it. It also may be said that the city was not in fault, except to the extent of creating an invalid bond ordinance; but the contract contemplated a compromise settlement as of that day in which the city should become the owner of the plant from that day and the water company the owner of the money, and both parties then desired that settlement carried into effect at that time.

"Also it may be noted that the situation which existed on the day for performance appears to render it peculiarly equitable, that in an accounting the contract shall be deemed to have been consummated on that day in accordance with the then mutual desire and purpose of the parties. In the contract of sale the water company had irrevocably waived its claim against the city for a large sum of money which it claimed was due to it, and for the recovery of a part of which suits were pending against the city at the time the contract was made. That waiver of claim was necessarily based upon the assumption that on and after the contract day for performance the water company would be relieved from the burden of further operation of its water supply plant and would enjoy the purchase price. In the meantime the water company had also paid off its mortgage indebtedness in

anticipation of the settlement on the agreed day. It cannot reasonably be assumed that the water company would have waived its claim of indebtedness of the city for operations under the contract to settlement day with any notion of thereafter operating under the same contract in any event. A waiver by the water company of what it claimed as contract rates of operation for a longer period would have called for additional consideration for such extended waiver.

"When the performance day arrived and settlement could not be made the water company did the only thing it could do. It continued to operate the water supply plant and to furnish water to the city *ex necessitate*. The inherent plan and quality of the contract of settlement was that the old water supply contract should be abrogated at the time set for settlement. The waiver of the rate of compensation claimed up to that time by the water company was not only irrevocable, but was necessarily based upon the expectancy of the plant passing to the city at that time. To extend the contract terms of operation beyond that time unseats the whole basis of settlement. The suggestion that subsequent to that time the old contract, with all the disputes connected with it, should be deemed revived and be made the basis of accounting from that date, not only violates the equitable rule touching the transmission of equitable title, but is obviously unjust, since the waiver of the amount claimed up to that time was, as already stated, necessarily based upon the expectancy of cessation of operations under the contract and receiving the purchase price at that time.

"This also appears probably to have been the view entertained by the parties in the early part of the operation of the plant after the settlement day, although no definite agreement was made touching the terms of operation subsequent to the date fixed for settlement. At the end of the first quarter after the date for settlement the water company rendered a bill to the city for $5,000, accompanying the bill with a letter in which it was stated, among other things, that

" 'because of the delay in settlement the water company had been without the use of the purchase price since January 1st, 1921 [contract date for settlement], and in addition has been paying the cost of operation of the plant since said date, the aggregate amount of interest on the purchase price and the operating expenses, exclusive of taxes, since January 1st, 1921, amounting to a sum in excess of $5,000, and whereas said water company, in view of its contract with the city, settlement under which was to have been made on or before January 1st, 1921, and settlement as of which date will be made under the terms of the contract, if and when the litigation now pending, or any other litigation which may hereafter be instituted, shall result favorably to the city, the said water company is in the position of operating the plant from and after January 1st, 1921, in the interest of the city, which is chargeable with interest on the purchase price, and operating expenses since said date; and whereas, if said litigation result in a determination that said contract of purchase is invalid, then there would be due to the Peoples Water Company from the city of Millville, for water supplied since November 1st, 1920, under the terms of the contract entered into under Ordinance No. 73, of the city, a sum in excess of $5,000. Therefore the Peoples Water Company respectfully requests the city of Millville to pay to it, on account, the sum of $5,000, without deduction for delinquent taxes, waiver of which is to be included in the agreed purchase price of the water plant, if the pending litigation be decided in favor of the city.'

"That bill was paid by the city May 21st, 1921, with the following letter accompanying the payment: 'Enclosed herewith please find order on the treasurer of the city of Millville in the sum of $5,000, which is tendered in accordance with bill presented by your Mr. Roth to the board of commissioners of the city of Millville, at their regular meeting on Friday, May 20th, 1921, and in conformity with agreement attached to said bill.'

"While this $5,000 would have been the amount due under the old contract at the rate contended for by the city, the bill, as presented, clearly sets forth that the water company was operating from and after January 1st, 1921, with the understanding that in the event of the settlement contract being sustained by the courts, the cost of operating the plant from January 1st, 1921, and interest on the purchase price from that date were to be paid by the city. The answer by the city appears to have accepted that view. Some subsequent payments have been made by the city of lesser

amounts in response to bills accompanied by letters similar to the one above quoted. Certain extensions of the water mains were also made by the water company after January 1st, 1921. Under the old contract such extensions would have been made at the expense of the water company; but these extensions were made under and by reason of a resolution of the city commissioners in which the city promised to pay the cost of the extensions providing the contract of sale should thereafter be sustained by the courts in the then pending litigation already referred to. That stipulation clearly negatived any notion of the parties that on January 1st, 1921, the water company had been relegated to operations under the old contract.

"It also is contended on behalf of the city that while the sale of the plant to the city included real estate, it also included the water pipes in the public streets of the city, which pipes, it is urged, are personal property. With this contention the following text of *39 Cyc. 1642* [*tit. 'Vendor and Purchaser'*], is invoked as an exception to the equitable rule above stated: 'It is also held that the rule does not apply in the case of an entire contract for the sale of both real and personal property.' The text above quoted is based on *Clinton* v. *Hope Insurance Co., 45 N. Y. 454,* and *Listman* v. *Hickey, 19 N. Y. Supp. 880; affirmed, 143 N. Y. 630.* Neither of these cited cases can be said to be applicable to the circumstances of this case. In *Clinton* v. *Hope Insurance Co.* the question was touching the right of an insurance company to be subrogated to the rights of an insured vendor who had contracted to sell a mill and its machinery, the machinery being in part personalty. A fire had destroyed the mill and the machinery after the date of the contract and before the date for consummation of the contract. The additional and material circumstance was also there present. that at the time of the fire the vendee held as a tenant of the vendor at an agreed rental by express stipulation of the parties. The loss was held to be the loss of the vendor. In *Jersey City* v. *Flynn, supra* [at *p. 115*], the rule is defined as

follows: 'It [the rule as to transmission of the equitable title] is kept within reasonable limits by the perfectly well-settled rule that in the absence of express stipulation the purchaser takes the rents and profits and pays interest on the purchase-money only from the time fixed for the completion of the contract, not from the time of its execution. *Fry Spec. Per.* § *891; King* v. *Ruckman, 24 N. J. Eq. 298; DeVisme* v. *DeVisme, 1 McN. & Gor. 336.* And, as I shall show hereafter, not always as early as that.' [The instances of later dates for the operation of the rule, due to default of the vendor, are pointed out by the learned vice-chancellor at *pp. 120, 121.*] The other case cited in *Cyc.* [*Listman* v. *Hickey*] also is a case in which the property was destroyed by fire before the date agreed upon for performance, and the vendor was not, in consequence, able to perform at the time contemplated by the contract for performance. In the present case, with the vendor without fault and able and willing to perform on the day fixed for performance and with no intervening event in any way changing either the nature or value of the property, there seems to be no sound reason for denying to it the application of the equitable rule now contended for by complainant merely because the contract of sale includes, in addition to real estate, water mains which defendant contends are in the nature of personal property and which are admittedly an essential and necessary and integral part of the plant which was sold for a gross amount as a complete and operating plant. In this view it becomes unnecessary to inquire whether water mains of a water company which are located in public streets can be regarded as personal property as between the parties to a contract of this nature; but it may be appropriately noted that even though considered personal property the water mains would clearly fall within that special class of personal property to which all equitable rules touching specific performance and its incidents obtain. See *Pom. Cont.* [*Spec. Perf.*] §§ *10, 11.*

"It is further urged on behalf of defendant that the city could not have lawfully contracted for complainant to operate

the plant as its trustee or agent and in consequence cannot be held to liability on any equitable grounds the result of which are not in harmony with the powers of the city by direct action. A sufficient answer to this is that the contract of purchase and its terms were in all respects lawful and within the powers of the city. The liabilities of the city under that contract flow from the contract and are to be considered a part of the contract, and in no sense a new contract by the city. The equitable status of the parties from the day fixed for performance flows from the contract and not from any new agreement or new obligation of the city; the accounting is an accounting wholly based on the rights of the parties lawfully created by the contract. Recognized equitable obligations flowing from the contract are a part of the obligations of the contract to the same extent as similar legal obligations.

"My conclusions are that complainant can equitably only be regarded as having operated the plant subsequent to January 1st, 1921, for defendant, and in the accounting is entitled to charge defendant with the reasonable cost properly incurred in operating the plant from that date to the date the plant was physically taken over and operated by defendant, and is also entitled to charge defendant six per cent. interest on the agreed purchase price of the plant from January 1st, 1921, to the date the purchase price was paid, and that defendant is entitled to credits for the several payments made on account for water supplied to it during that period, and is entitled to retain all moneys collected by it for water rents from consumers, and no account is to be taken of water used by the city for fire and flushing or other city purposes during that period.

"Contention also exists touching the liability of the city to pay the cost of construction of certain extensions made by complainant to water mains during the period the plant was operating subsequent to January 1st, 1921. The city desired these extensions made and passed a resolution to the effect that the cost incurred by complainant in making the

extensions would be paid by the city in addition to the purchase price of the plant in the event of the contract of sale of the plant being sustained by the courts. A copy of the resolution will be found in *Franklin* v. *Horton, 116 Atl. Rep.* [at *p. 176*]. These extensions were admittedly made by the water company on the faith of that resolution of the city commissioners and no claim is made that the cost was excessive. Subsequently, on *certiorari*, in the case last cited, the resolution was declared to be contrary to the provisions of the Welsh act, in that it was adopted without remaining on file for two weeks before its final adoption as required by that act. The city has since taken over the plant and is in enjoyment of these extensions. Counsel for the city declares the city's willingness to pay, but doubts its right to do so.

"It seems clear that there can be no present recovery of this claim, notwithstanding the fact that it is a just claim and the further fact that the city is now enjoying the extensions which the water company in good faith has supplied in reliance upon the solemn promise of the board of commissioners to pay for the cost of construction. In this class of claims the essential inquiry is touching the power of the municipal corporation. Defendant municipality enjoyed the power to order this work and to agree to pay for it, but the power so enjoyed is a specifically restricted one. By section 6 of the Walsh act, as amended by *P. L. 1912 p. 649,* as pointed out in *Franklin* v. *Horton, supra,* that power can be exercised only by ordinance or resolution adopted in the manner there prescribed. The legislative restriction touching the exercise of the power is no less potent than the power affirmatively conferred. No other source of power has been brought to my attention. Obviously, the implied promise to pay arising from the acceptance of the work cannot rise above an express promise to pay for the same work, and the express promise has been declared to be unauthorized by law and void because of the statutory restriction touching its exercise. In *Frank* v. *Board of Education, 90 N. J. Law 273,* con-

sistently with *Bourgeois* v. *Freeholders of Atlantic County, 82 N. J. Law 82,* our court of errors and appeals has clearly defined the effect of ratification and implied liability to be wholly dependent upon and only co-extensive with the power to contract. If defendant municipality desires to respect this admittedly honest obligation there appears to be no obstacle to its doing so at any time by an ordinance or resolution directing payment; it is a just debt. But the power to authorize its payment must be exercised by ordinance or resolution passed in the manner specifically required by the statute.

"A question has also been raised touching taxes. Admittedly, the taxes prior to January 1st, 1923, had been discharged by the settlement agreement. I see no reason why, as to subsequent taxes, the general rule should not be followed exempting a vendor from the burden of taxes from the date the equitable title passes to the vendee.

"In the briefs it is stated that at the time the plant was turned over to the city certain supplies, such as coal and other material used in operating the plant, was turned over to the city. Defendant contends that these are properly to be considered a part of a going concern and are covered by the purchase price of the plant, and further urges that if not so considered no recovery can be had for such supplies because the Home Rule act of 1917 as well as the Crimes act requires all purchases of supplies in excess of $500 in amount to be by advertising

"I find nothing in either the bill or answer relating to these supplies or their nature and do not think it proper to include a consideration of that controversy in these conclusions.

"A reference will be made to a master for an accounting pursuant to these conclusions."

*Mr. John D. McMullin,* for the appellant.

*Mr. Louis H. Miller,* for the respondent.

PER CURIAM.

The decree appealed from will be affirmed, for the reasons stated in the opinion filed in the court below by Vice-Chancellor Leaming.

*For affirmance* — THE CHIEF-JUSTICE, TRENCHARD, PARKER, MINTURN, KALISCH, BLACK, KATZENBACH, CAMPBELL, HEPPENHEIMER, ACKERSON, VAN BUSKIRK, CLARK —12.

*For reversal*—None.