## Insurance Co. of the State of Pa. v. Mather

*J. Bruce McKissock,* for Insurance Co. of the State of Pa.

*Neal R. Cramer,* for Helen B. Mather.

*Lloyd H. Fuge,* for Foster Rutter.

*Gerald J. Cipriani,* for Virginia Knorr.

*Ronald C. Scott,* for Boy Scouts of America.

SILVESTRI, *J.,* January 16, 1985—We have before us exceptions of petitioner, Insurance Company of the State of Pennsylvania, to this court's verdict of October 18, 1984. Petitioner, in seeking declaratory relief, requested that this court interpret an insurance policy issued by it as being void and rule that it had no obligation thereunder to indemnify or defend the estate of the named insured. After a non-jury trial, this court found in favor of defendants and intervenors and dismissed petitioner's petition for declaratory judgment. Petitioner filed timely exceptions. The exceptions were submitted on briefs alone without argument. After review of the positions presented therein and for the reasons

set forth below, we dismiss petitioner's exceptions and order judgment to be entered on the verdict of the court.

Petitioner had, through its underwriter, issued an aviation insurance policy to Robert Mather and Foster Rutter in February of 1982, which policy covered a Cessna Skyhawk aircraft. The policy contained certain conditions and exclusions, one of which provided that coverage would be disallowed if the aircraft was operated by a pilot "not properly certificated, qualified and rated under the current applicable Federal Air Regulations . . ."[1] In September, 1982, the aircraft carrying Mather and three passengers crashed, killing all four persons aboard. The personal representatives of two of the passengers filed suit against the estate of Robert Mather thereafter.[2] Petitioner brought this declaratory judgment action to avoid coverage under the policy based upon the exclusion referred to above.

It is petitioner's position that, implicit within the meaning of "properly certificated" as used in the insurance policy, is the requirement of possession of a valid medical certificate. Mather, at the time of the accident, did possess such a certificate. It is also petitioner's position, however, that Mather obtained his medical certificate through fraud: it is alleged

_____

1. See Exhibit 1, Aviation Policy, p. 2, para 2(b), attached herein as Appendix A.

2. The personal representatives of passenger David Knorr and Robert Smith, as well as the Boy Scouts of America, were given leave of court to intervene in this declaratory judgment proceeding. In addition, Foster Rutter, named as defendant in the caption of the case, has filed an answer, new matter and counterclaim to this petition. There is no allegation in the body of the petition against Rutter, however. No evidence was placed on the record as to Rutter at the time of hearing. Therefore, a verdict was directed in Rutter's favor at the conclusion of the non-jury trial. No exceptions have been filed as to our verdict in favor of Rutter.

that, at his medical examination conducted by the FAA appointed flight examiner, Mather did not disclose the fact that he had been diagnosed as suffering from angina pectoris and placed on medication.[3] Petitioner sought to have this court rule that Mather was not properly certificated, and hence relieve petitioner of its obligation, based upon the allegation that the medical certificate was obtained through fraud. Petitioner was prepared at trial to submit evidence and testimony in support of its allegations. This court concluded, however, that it would not interpret the insurance policy to include terms and conditions which were not specifically delineated therein; we would not read "valid medical certificate" into the policy when the policy did not use those or similar terms. We also concluded that we did not have jurisdiction to inquire into the validity of the medical certificate which had been properly issued by an administrative authority.

Since petitioner's case was based primarily upon the validity or invalidity of Mather's medical certificate, our conclusion not to consider that matter left petitioner with very little on which to proceed. Therefore, at the time of trial, and after extensive preliminary discussions as to the theory of petitioner's case, the jurisdiction of the court and the nature of the testimony to be presented, it was agreed that petitioner should submit an offer of proof. The court, upon receiving the offer[4] and after appropriate objection by defendants and intervenors, ruled that the testimony would be irrelevant to the matter

---

3. Both the condition of angina pectoris and the drug prescribed for its treatment are grounds to disqualify a pilot from medical certification. See 14 C.F.R. Part 67.17(c).

4. Petitioner's offer of proof is attached herein as Appendix B.

of interpretation and construction, of the insurance policy and excluded the testimony as submitted in the offer. After defendants and intervenors had rested and moved for directed verdict, the court granted the motions and directed a verdict for those parties. Petitioner's exceptions to this verdict are now before us for determination.

Petitioner raises five exceptions. They are: (1) that the court erred in excluding evidence which would have established that Mather made material misrepresentations to the FAA medical examiner; (2) that the court erred in excluding evidence which would have established that Mather would not have obtained a medical certificate if he had revealed his prior medical history; (3) that the court did have jurisdiction to determine the validity of the medical certificate at issue; (4) that the court erred in ruling that "the policy must specifically state that misrepresentation of material facts in the procurement of a medical certificate will be a basis for avoiding coverage" in order for coverage to be avoided; and (5) that the court's verdict was against the weight of the law.

Petitioner's allegation that the verdict was against the weight of the law is a boiler-plate exception and has not been specifically briefed. " 'Boiler-plate' motions, such as 'the verdict was against the weight of the law' or 'against the evidence' are not sufficient because 'counsel's precise statement of issues and grounds relied upon in written form [is necessary to] insure . . . that both the trial court and the [opposing party] have adequate notice of the legal theories being advanced' . . ." Carnicelli v. Bartram, 280 Pa. Super. 424, 433 A.2d 878, 881 (1981). We therefore dismiss that exception without further discussion.

We address first petitioner's third exception to our verdict. Petitioner contends that this court did in fact have jurisdiction to consider the legitimacy of decedent's medical certificate and could have declared it invalid. Although the parties could cite us no authority in Pennsylvania which directly addressed the issue before us, defendant and intervenors rely upon a New York case to support their contention that we did not have jurisdiction to invalidate a properly issued FAA medical certificate. In that case the pilot and his spouse were killed in an air accident. The insurer contested the coverage based on policy language that the aircraft be operated only by pilots "holding valid and effective pilot and medical certificates." Guyer v. United States Fire Ins. Co., 97 A.D. 2d 964, 468 N.Y.S. 2d 818 (1983). The insurance company argued that because the pilot had made false statements to the FAA when he applied for the medical certificate, such certificate was therefore invalid at the time of the crash, which voided insurance coverage. The court rejected this argument on two grounds. First, it noted that any misrepresentations made by the pilot were made to the FAA and not to the insurer:

"The insurer obviously must be charged with knowledge of the procedures employed by the F.A.A. in issuing medical certificates. It would have been a simple matter in preparing the form for this special type of policy to include specific language that any misrepresentation made in the application for a medical certificate would void the policy."

Secondly, the FAA would have been the appropriate agency to have initiated action to revoke or suspend a wrongfully obtained medical certificate.[5] Be-

5. 49 USCA §1429, Pub.L. 85-627, Title VI, §609, Aug. 23, 1958, 72 Stat. 779; Pub.L. 92-159, §2(a), Nov. 18, 1971, 85 Stat. 481; Pub.L. 92-174, §6, Nov. 27, 1971, 85 Stat. 492.

cause there had been no declaration invalidating the pilot's medical certificate, the pilot was in compliance with the policy language. The court went on to note that, "it is not the function of the insurer or of this court to make such declaration" as to the validity of the certificate.

Petitioner argues that the Guyer court, and this court, were in error in refusing to consider the validity of the medical certificates. Petitioner argued that because the FAA would refuse to revoke the medical certificate of a person who is deceased, petitioner should not be required to pursue its remedy before the FAA.[6] At all times subsequent to the issuance of the certificate, however, and until the death of Mather, the validity of the policy could properly have been challenged by the petitioner before the FAA. In fact that avenue would be the exclusive means through which to attack the validity of the certificate. The Federal Aviation Act[7] states, inter alia, that a certificate can be revoked by the administrator:

"§1429. Reinspection or reexamination; amendment, suspension, or revocation of certification

---

6. Petitioner has attached in its brief, Exhibit B, Appendix 2, a letter from the FAA which states that the FAA would not revoke the medical certificate of the decedent in the Guyer court. The letter indicated that §609 of the Federal Aviation Act of 1958 (49 USC §1429) states that the administrator may revoke a certificate when public interest or safety in air commerce demands it; since the holder of the certificate was dead, no public interest was in jeopardy. Likewise, after this court's decision, petitioner requested that the FAA revoke Mather's certificate. The FAA has refused to consider the complaint, since the deceased pilot presented no threat to public interest or safety.

7. See generally, 49 USCA §1301, et seq.; Pub.L. 85-726, Title I, §101, Aug. 23, 1958, 72 Stat. 737.

"(a) The Administrator may, from time to time . . . reexamine any civil airman. If, as a result of any such reinspection or reexamination, or if, as a result of any other investigation made by the Administrator, he determines that safety in air commerce or air transportation and the public interest requires, the Administrator may issue an order . . . suspending, or revoking, in whole or in part, any type certificate. . . ."[8]

The act also provides for review of such orders:

"49 USCA §1486. Judicial Review

(a) any order, affirmative or negative, issued by the Board of Administrator under this chapter . . . shall be subject to review by the Court of Appeals of the United States ⁄ . . upon petition, filed within 60 days after the entry of such order, by any person disclosing a substantial interest in such order.

• • •

(f) the judgment and decree of the court, affirming, modifying, or setting aside any such order of the Board of Administrator shall be subject only to review by the Supreme Court of the United States."[9]

The Supreme Court of the United States has stated: ". . . [W]here Congress has provided statutory review procedures designed to permit agency expertise to be brought to bear on particular problems, those procedures are to be exclusive." Whitney Nat. Bank v. Bank of New Orleans, 379 U.S. 411, 420 (1965). That is the rule followed in this jurisdiction as well. Veerasingham v. Sharp, 61 Pa. Commw. 460, 434 A.2d 221 (1981). Such reasoning applies also in aviation cases. "It is clear from the statutory

---

8. See footnote 5.

9. Pub.L. 85-726, Title X, §1006, August 23, 1958, 72 Stat. 795; Pub.L. 86-346, §1, June 29, 1960, 74 Stat. 255, Pub.L. 87-225, §2, September 13, 1961, 75 Stat. 497.

scheme established by Congress that [an] F.A.A. order was not subject to collateral attack in the district court." Gaunce v. deVincentis, 708 F.2d 1290, 1293 (7th Cir.), cert. denied, 104 S. Ct. 417 (1983). "Under settled principles applicable to review of agency action, Congress may select the forum in which review may be had and special statutory review procedures take precedence over whatever non-statutory review might otherwise be available in the district court." Nevada Airlines, Inc. v. Bond, 622 F.2d 1017, 1020 (9th Cir. 1980).

It is clear from the above cases and the Federal Aviation Act that the exclusive means by which petitioner could attack the medical certificate issued by the FAA is through the statutory provision cited above for review by the administrator of the FAA. That petitioner cannot do so now because Mather is dead is not relevant. At the time of his death, Mather held a valid medical certificate. Only the FAA could revoke the certificate and only the Court of Appeals and the Supreme Court of the United States could review the revocation by the agency. This court is without jurisdiction to invalidate decedent's medical certificate. We dismiss petitioner's third exception to the verdict.

Petitioner's first and second exceptions allege that this court erred in excluding evidence which would have established that Mather made material misrepresentations to the FAA medical examiner and that said examiner would have refused to issue a certificate if he had known of Mather's medical history. In view of our determination that this court had no jurisdiction to inquire into the validity of the medical certificate, any evidence concerning the proceedings before the medical examiner or concerning the examiner's alternate conclusion based upon Mather's actual medical history would have

been irrelevant. The proceeding, absent consideration of the legitimacy of the certificate, is one only of construction and interpretation of the insurance policy. We therefore dismiss petitioner's first and second exceptions.

Finally, petitioner argues that this court erred in ruling that the policy must specifically state that misrepresentation of material facts in the procurement of a medical certificate will be a basis for noncoverage in order for coverage to be avoided. The law is clear in Pennsylvania that the language of an insurance policy "must be read in its entirety; it should be construed according to the plain meaning of the words used, so as to avoid ambiguity while at the same time giving effect to all its provisions." Blocker v. Aetna Casualty and Surety Co., 232 Pa. Super. 111, 332 A.2d 476, 478 (1975).

As we noted above, the phrase in dispute in this case is the exclusion which provides:

"This policy does not apply

. . .

"2. To any insured while the aircraft is in flight

. . .

(b) if piloted by a pilot not properly certificated, qualified and rated under the current applicable Federal Air Regulations for the operation involved. . . ."

Petitioner requests that this court qualify the term "properly certificated" as including the possession of a medical certificate which has not been obtained by fraud or misrepresentation. "Properly certificated" is not an ambiguous term which demands the court to read in requirements which are not there. Although there is no Pennsylvania decision which addresses the precise issue in the instant case, other jurisdictions have dealt with similarly worded policies.

In Royal Indemnity Co. v. John F. Cawrse Lumber Co., 245 F. Supp. 707 (D.C., Ore. 1965), the court refused to interpret policy language requiring a pilot to hold a current pilot certificate to include the requirement that the pilot also have a current medical certificate. The court stated that it was clear from the regulations that the FAA intended the certificates to be entirely separate from one another. And, if the insurance company intended to include the requirement of a medical certificate, it should have done so expressly in the language of the policy.

The fifth circuit has also refused to go behind the validity of a pilot's certificate to deny coverage. Ranger Ins. C. v. Culberson, 454 F.2d 857 (5th Cir. 1961) cert. denied, 407 U.S. 916, 92 S.Ct. 2440, 32 L.Ed. 691 (1961). The Pilot Clause in that case required that the insured hold "proper pilot certificates with the appropriate ratings required by the FAA." 454 F.2d at 861. The insured held a valid student license, but violated FAA policy by flying with a passenger. That flight ended in the death of both pilot and passenger. The insurance company claimed that because the insured violated the FAA regulations in taking a passenger, the student license was no longer "proper" under the policy and therefore coverage was voided for the fatal flight.

The court rejected the insurance company's arguments:

"We do not read the word 'proper' as requiring exact compliance with the face of the certificate. It is quite proper for an insurance company to insure a pilot for any permutation of circumstances, whether or not that permutation involves conduct that violates the certificate or the FAA regulations (citation omitted). It is the policy, not the FAA regulations,

that sets the perimeters of insurance coverage." 454 F.2d at 861.

The court stated that if the insurance company wanted to suspend coverage when and if an insured violated a certificate or an FAA regulation, it should specifically delineate such circumstances in the policy.

In the present case, there is no express language in the policy to the effect that insurance coverage is conditioned upon a valid medical certificate or that the requirements for an FAA medical certificate are incorporated into the terms of the policy. The language merely requires that the insured be "properly certificated," which under the then current and applicable Federal Air Regulations required that an "appropriate, current medical certificate" be in the pilot's possession. 14 C.F.R. Part 61.3(c). Mather did have a current medical certificate in his possession when the flight was commenced. At that point he was in strict compliance with terms of the policy.

The fifth circuit, in Culberson, supra, also set forth compelling public policy concerns which outweighed voiding coverage because of a violation of a regulation or the existence of an invalid certificate. First, the court deemed that the logic of denying coverage on these bases would "engraft as exceptions to coverage the violation of every proscribed piccadillo of FAA regulations." 454 F.2d at 864. Second, the court stated that insurance companies must be held to the language of the agreements they draft and any ambiguity will be resolved in favor of the insured. "If an insurance company has an intent to deny coverage in a specific set of circumstances, then it should so delineate." 454 F.2d at 865. The court's final concern was that the FAA regulations specifically provide that a pilot's certificate (or other) ceases to be "effective only if it is sur-

rendered, suspended, or revoked" by the FAA. 454 F.2d at 864.

It is clear from the language of the policy in the instant case that there was no requirement for a valid, current medical certificate independent from the requirements of the Federal Aviation Regulations. It is equally clear that petitioner could have expressly conditioned coverage on compliance with FAA regulations or expressly stipulated that a material misrepresentation or omission perpetrated upon the FAA in procuring a medical certificate was the equivalent of fraud upon the insurer. The petitioner did not do so, however. The policy requires only that the pilot be "properly certificated". Mather was "properly certificated" in that he held a medical certificate which had not been suspended or revoked by the FAA.

The petitioner would have this court create an ambiguity in determining that "properly certificated" means "possession of a valid medical certificate which has not been obtained through material misrepresentation." There is no need to place such an interpretation on the clear term "properly certificated." If petitioner wishes to exclude from coverage those pilots who it determines should have been refused medical certificates by the FAA, it can use language which so states. Petitioner did not write the present policy in that manner and this court will not rewrite the policy to include those terms. We therefore determine that petitioner's fourth exception to our verdict is without merit and we dismiss that exception.

We enter the following

## ORDER

And now, this January 16, 1985, it is hereby ordered that the exceptions of petitioner be dismissed;

judgment is to be entered on the verdict of the court after payment of the appropriate fee, if any.

## APPENDIX A
## DECLARATIONS

Policy Number .............................. AV 983-4031
Previous Policy no. ................................... NEW
This page with "Policy Provisions—Part 1" Form AV 2066-G and all endorsements attached hereto completes this numbered aviation physical damage and liability policy, issued by the company as indicated by an "X" in the box to the left of the company's name (hereinafter called the Company).

## THE INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA

ITEM 1.
Named Insured ..........................................
Foster P. Rutter & Robert Mather
Address ...................................................
166 Crestview Drive, Pittsburgh, PA 15236

ITEM 2. Policy Period: From Feb. 6, 1982 to Feb. 6, 1983 12:01 a.m. standard time at the address in Item 1. The insurance afforded is only with respect to such and so many of the following coverages as are indicated by specified premium charge or charges. The limit of the company's liability against such coverage shall be as stated herein, subject to all of the terms of this policy having reference thereto. If more than one aircraft is insured hereunder the terms of this policy shall apply separately to each.

ITEM 3. Liability Coverages
B. Property Damage .. Each Person XXXX
D. Single Limit Including Passengers .......
.............................. Each Person XXXX

Each Occurrence ............. $1,000,000
With Passenger Liability limited internally to: .......... Each Person $100,000
Each Occurrence ..................... XXXX
Liability Premiums ................... $245
Liab. Total ................................ $245

ITEM 4.  Description of Aircraft and Physical Damage Coverage hereunder:

F.A.A. Cert. ................................. N8285L
Make and Model ............ Cessna Skyhawk
Year Built ............................................ 67
Seats Crew .............................................. 1
Seats Pass. ............................................. 3
Insured Value ............................ $10,000
Physical Damage Cov. ............................ F
Physical Damage Premiums ............. $400
Not in Motion .................................... $50
In Motion. Ingestion. or Mooring ..... $250
Physical Damage Total ..................... $400
Policy Premium ................................ $645

ITEM 5.  When in flight the aircraft will be piloted only by
As Endorsed

ITEM 6.  The aircraft will be used only for the purpose indicated by "X" below (see Definitions).
Pleasure and Business

ITEM 7.  LOSS PAYABLE: Any loss under coverage F, G and H is payable as interest may appear to the named insured and
N/A

ITEM 8.  The named insured is and shall remain the sole owner of the aircraft and the aircraft is not subject to any encumbrance other than as indicated herein.

Producer .............. Davidson & Derion Ins.,
246 Washington Rd., Pittsburgh, Pa. 15216.
Countersigned . Feb. 6, 1982, As Endorsed.
Southeastern Aviation Underwriters, Inc.

## APPENDIX B

Mr. Scott: If I may sir, I would like in advance to exclude from our objection, into evidence, the policy, itself. I think that the policy should be in evidence in order that Your Honor may make that quite correct ruling. I am sure he is going to offer it, but I will not object to that offer.

The Court: I understand. All right. So what we are going to exclude is a matter relating to the physical condition of decendent by—I want the policy in, and the language that he is relying on, the language which was offerred. Go ahead.

Mr. McKissock: Your Honor, the offer of proof that I will be making and the position of the petitioner in this case is that under Pennsylvania law a person who has procured a certificate or rating such as a pilot's rating, medical certificate by means of fraud and misrepresentation, does not actually have a valid or proper certificate or rating.

And in support of that position we would prove to the court that under the applicable Federal Air Regulations, to act as pilot in command of any flight, a pilot is required to have both a proper pilot's certificate and a proper medical certificate; and that a proper medical certificate requires obtaining that certificate not by means of fraud and misrepresentation.

We would intend to prove that Robert Mather was acting as pilot in command of the aircraft involved in this accident on September 26, 1980. And he was the only pilot on board the aircraft at that time.

We would intend to prove that on September 26, 1982 Robert Mather did not have a properly issued medical certificate as he was required to have, to act as pilot in command of that flight, on that day.

We will prove that on April 27, 1982 Mr. Mather presented himself through a Dr. Frederick Terkel, a certified, or a FAA flight medical examiner who was based in the Mt. Lebanon area.

We would offer as evidence as part of that examination a form filled out by Mr. Mather for his FAA medical certificate, in which questions were raised concerning medication, heart trouble, recent hospitalization and nervous problems, that in response to the question of any medications being taken, he responded no; that in response to the question of any heart trouble, the response was no. In response to the question of any recent hospitalization or any hospitalization while the block yes was checked, the doctor would testify that the person indicated no recent or no change in his prior hospitalization. He had been previously hospitalized for a hernia operation; and that the block no was checked as far as nervous problems.

Dr. Terkel will testify, if I am permitted, to testify that this form was filled out, completed and signed by Mr. Mather. And the form states, "I hereby certify that all statements and answers provided by me in this examination form are complete and true to the best of my knowledge. And I agree that they are to be considered part of the basis for issuance of any certificate to me. I have also read and understood the privacy act statement that accompanies this form."

Dr. Terkel will testify that based on that information being submitted to him and the responses made by Mr. Mather to the questions, he issued the third and last medical certificate which Mr. Mather

did have in his possession, or we believe in his possession, at the time of this flight.

We would want to offer evidence that in the one year prior to the April 27, 1982 examination of Mr. Mather by Dr. Terkel, that Mr. Mather had, in fact, had heart trouble, a clinical diagnosis of angina pectoris, a diagnosis of coronary artery disease, intermediate stage; and undergone an angiogram catheterization at Mercy Hospital, at which time he was hospitalized for about three and a half days, that the result of the angiogram showed blockage, I believe, in three or four of the arteries, ranging in some of the arteries from 30 to 50 percent, and two of the other arteries, 50 to 70 percent; that as a result of this treatment or diagnosis, he was placed on the drug Isordil, which is used to treat coronary artery disease, a dosage of five milligrams taken four times a day, sublingually, which Dr. Stafford has testified was a fairly susbstantial dosage.

We will also offer evidence that Dr. Stafford treated Mr. Mather starting with the initial visit in July 1981, and saw him, I believe, a total of six or seven times over the next year, with the last visit being some time in the summer of 1982; that during that time he continued Mr. Mather on Isordil. And, in fact, one of the visits with Dr. Stafford was within two weeks prior to the examination and meeting of Mr. Mather with Dr. Terkel.

We would also submit a record from the Southwest Health Center which shows an indication that Mr. Mather stated that in his past he had sustained a nervous breakdown.

Dr. Terkel will then testify that had any of these conditions been made known to him, either the fact that Mr. Mather was on medication, Isordil, that he had been diagnosed, clinically diagnosed of sustaining angina pectoris, and the records would show

that Mr. Mather told Dr. Stafford, the treating cardiologist, that he had, I believe, had three or four episodes of angina pectoris, the most recent one being within three weeks of July 13, 1981; that had Mr. Mather revealed that he had undergone an angiogram, had he revealed that they found blockage of the amounts and percentages I noted, had he indicated that anytime in his prior history he had sustained a nervous breakdown and nervous problem on any of these conditions, he would not have issued the medical certificate. He would have denied the medical certificate to Mr. Mather.

Dr. Stafford would also testify that in regard to the discussion he had with Mr. Mather, he specifically told Mr. Mather that Mr. Mather was to comply with the Federal Air Regulations, as they cover flying in the operation of aircraft, and that was specifically covered, I believe, on two occasions.

Dr. Stafford would also testify that while he is not a FAA flight surgeon, has never had experience in that regard, he also told Mr. Mather not to operate an aircraft unless there was another pilot on board.

We would also offer evidence that Mr. Mather was involved in Boy Scout flying programs, and that he was aware of the various Federal Air Regulations that applied to pilots and, in fact, under the Federal Air Regulations, a pilot is required to be knowledgeable with all of those items.

We would also offer the testimony of Dr. Otto Swegal, who would testify that he is a senior FAA medical examiner, and that under the standards applicable for the examination of pilots, for the application for third class medical certificates, in effect, both at the time this examination took place and also at the time this flight took place, that Mr. Mather would have been denied his certificate by the designated medical examiner, and it would then be up

to Mr. Mather if he wanted to take an appeal, to try to get that reversed, to appeal to the FAA, Oklahoma City.

We also would offer evidence by way of the autopsy report, that on the autopsy performed on Mr. Mather after the accident, he was found to have a 95 percent occlusion of one of his descending arteries.

We would show that the Federal Air Regulations that apply to this flight prohibit a pilot, this flight was in September of 1982, from flying as pilot in command of an aircraft if he had either a clinical diagnosis of angina pectoris or coronary artery disease that required treatment. And our evidence would show that he, in fact, suffered from both of these conditions.

We would introduce the insurance policy which contains the provisions previously cited to the court, which provide that for coverage to be in effect, the policy which I would offer into evidence here for all of its terms, stated that there would be coverage. And this policy does not apply to any insured while the aircraft is in flight, if piloted by a pilot not properly certified, qualified and rated under the current applicable Federal Air Regulations for the operation involved, whether or not said pilot was designated in the declarations.

The policy also provides that under Paragraph 19 of the conditions entitled Fraud or Misrepresentation, this policy shall be void if the named insured has concealed or misrepresented any material fact or circumstance concerning the insurance or the subject thereof, or in the case of any fraud, attempted fraud or false swearing by the named insured, touching on any matter relating to this insurance or the subject thereof, whether before or after a loss. We would offer into evidence that Mr. Rutter, who

was the co-owner of this aircraft, inquired of Mr. Mather whether Mr. Mather had any physical impairment. Mr. Mather stated no, in response to that. And that information was submitted to the insurance company.

We would also offer that the insurance brokers, Davidson & Derion, who placed this insurance, who were contacted by Mr. Rutter to obtain the insurance, would testify that it was their understanding to be properly certified a pilot had to have a valid medical certificate, and not one that was procured by fraud or misrepresentation.

We will also show that at no time during the procurement of this insurance or after the policy was forwarded to Mr. Mather, did Mr. Mather ever raise any question concerning any of the terms or conditions of the language stated in the policy.

Just to be clear for one point, does Your Honor want me to refer to the various Federal Air Regulations that we would rely on in these positions that we have taken? It is our position that as to regulations—

The Court: I think those are legal matters.

Mr. McKissock: Yes, those regulations, we submit, are binding as law for this Court.

The Court: The offer of proof only deals with fact.

Mr. McKissock: Yes.

The Court: Doesn't deal with what the FAA regulations are, although what they are is fact, their application is law.

I think that you can argue the Federal regulations in light of the fact at the appropriate time, on the exceptions you are going to file.

Mr. McKissock: Pardon me? On the exceptions I am going to file?

The Court: Yes, to get the Appellate Court to rule you have to file exceptions.

Mr. McKissock: That's what I thought Your Honor said. You anticipate my actions.

The Court: If you are not going to file exceptions, Mr. McKissock, I wouldn't ask you to put an offer of proof on. I am trying to save some time.

Mr. McKissock: And the rest would be legal argument, or reference to citations.

If I could just—I believe I have covered everything, but perhaps while Your Honor is making closing remarks, If I want to add something else—

The Court: Do you want to review, see if you have anything further, double check?

Mr. McKissock: I would like, if something comes to mind in the next few minutes, I can always add that to the record.

The Court: All right, can we say, Mr. Scott, you are speaking for all defendants?

Mr. Scott: Seems to have fallen that way.

The Court: And Mr. McKissock, you will stipulate that Exhibit 1 is the policy?

Mr. Scott: May we look at that, sir?

The Court: Whatever the policy is, it is going to be marked Exhibit 1. And that is the policy, you will stipulate that it is?

Mr. McKissock: Your Honor, the reference that I have made to various medical records and hospital records which we would be introducing, I did not go through those. We will introduce all of the records from the Southwest Medical Center from Dr. Stafford. These are various correspondence and information he compiled, the medical records from Mercy Hospital including the catheterization procedure; and the medical application filed by Mr. Mather when he took his physical.

Those would all be items that we would be introducing. Do you want those made available to the Court to be made part of this offer of proof?

The Court: Please, the answer is no, provided you state and he would agree that those relate to his coronary condition as you have outlined what the doctors would testify to.

Mr. Scott: I have what might be a helpful suggestion. I have a copy of the deposition of Dr. Stafford—

The Court: Please.

Mr. McKissock: These are all marked as Deposition Exhibits in our deposition. They contain evidence of his coronary condition.

The Court: All right. The only thing I want, as you say, that you stipulate that Exhibit 1 is the insurance policy. And you can get together with him and give me an Exhibit 1.

Mr. Scott: Yes, sir.

The Court: All right.

Mr. Scott: Objection, sir.

The Court: To what?

Mr. Scott: To the entire offer of proof as irrelevant in this case. It is insufficient under the law, to establish a lack of coverage.

The Court: Mr. Fuge.

Mr. Fuge: In addition, Your Honor, I would object to the admissibility into evidence of the proposed testimony of Dr. Rutter, since that addresses the matter of application for the insurance policy which is not attached to the policy; and more specifically, since that is the only illusion to Dr. Rutter.

And I would also be adding argument for the court's consideration, for Dr. Rutter to enjoy the benefit of several rulings by the court.

May I proceed?

The Court: Anything further?

Mr. Fuge: Yes. If I may proceed on that?

The Court: I don't want any argument, I just want your objections to the offer.

Mr. Fuge: This is further motion, which I think would be more appropriate afterward, but my only objection to the offer is relative to the matter about Dr. Rutter. And I join in the objection to the relevance.

The Court: Very well.

Mr. Scott: I did not make a separate objection to any of the testimony with respect to the application, because Your Honor has already ruled on that.

The Court: I already ruled on that.

Very well, the objection to the offer is sustained. Is there anything further, Mr. McKissock, by way of evidence that you wish to present?

Mr. McKissock: No, Your Honor, not at this time.

The Court: Then you would rest?

Mr. McKissock: Excuse me, there was one more thing I would offer, yes, that in Mr. Mather's pocket at the time when the crash occurred, they did find a tin, an Anacin tin in his shirt pocket, that contained Isordil tablets.

The Court: All right, anything further that would be part of the offer?

Mr. McKissock: Yes, that is the offer.

Mr. Scott: Same objection, Your Honor.

The Court: I assume, Mr. Fuge, you join in that?

Mr. Fuge: Yes, Your Honor.

The Court: That is sustained, also. Any further evidence you have?

Mr. McKissock: No. At this point I believe the court has articulated its reason for stating—

The Court: We're just perfecting the record, mechanics, is all we are going through now. Do you have any other evidence to offer?

Mr. McKissock: Not at this time.

The Court: Then you rest?

Mr. McKissock: We have rested.

Mr. Scott: I move the court for the entry of a verdict in favor of the respondents and intervenors, and against the petitioner.

The Court: Do you rest?

Mr. Scott: And I rest, yes, sir.

The Court: No, no, you rest first.

Mr. Scott: Well, I was going to do it at the end of his case, before I started mine.